## VERIFICATION AND AFFIDAVIT IN SUPPORT OF COMPLAINT

I, Michael Bush, being duly sworn, depose and state:

## I. INTRODUCTION

1.	I have been a Special Agent with the Federal Bureau of Investigation for over twenty-five years.  I am currently assigned to the Dayton Resident Agency of the Cincinnati Field Division. In connection with my official duties, I investigate violations of Federal criminal  laws, to include white collar crime matters, which include offenses involving fraud by wire (18 U.S.C. §1343), money laundering (18 U.S.C. §1956 and 1957), and conspiracy to commit such violations (18 U.S.C. §1349). I have participated in the execution of numerous search and seizure warrants. These warrants have included the search of businesses and residences of individuals involved with fraudulent schemes including wire fraud, embezzlement, money laundering and tax evasion.  I have also received additional specialized training in money laundering and asset forfeiture.

2.	This investigation is being worked jointly with the IRS-CI, wherein Special Agent (SA) Laurel Vant is the co-case agent.  SA Vant is experienced in the investigation of possible violations of the Internal Revenue Laws (including Title 26 U.S.C. §7201), the Bank Secrecy Act (Title 31 U.S.C. §§5311, 5316, 5322, 5324 and 5331), the Money Laundering Control Act (18 U.S.C. §§1956 and 1957), and related offenses.

3.	Based on my training, experience and participation in financial investigations, and based upon the experience and knowledge of other agents of the IRS-CI, FBI, Ohio Department of Commerce, US Department of Labor, Office of Inspector General, and local law enforcement officers, who were involved with this investigation from its onset, I know:

	a.	That individuals who receive funds from a particular crime will attempt to legitimize the proceeds of the crime by depositing the funds into bank accounts in nominee names. These individuals will often launder the funds through these nominee bank accounts in an attempt to further conceal the disposition of the funds.

	b.	That individuals who receive funds from a particular crime will attempt to conceal the disposition of these funds by purchasing personal assets with cash.  These individuals use, control and maintain these assets in their residences and will maintain receipts from these assets in their residences.  These documents include car titles and deeds.

4.	Based on my training, experience and participation in other financial investigations, and based upon the experience and knowledge of agents of the IRS-CI, FBI, and other federal, state and local law enforcement, who were involved with this investigation from its onset, I also know:

a.      A pyramid scheme is structured like a pyramid with the initial recruiter and investor(s) at the apex of the pyramid. Additional people are recruited to "invest" typically with promises of large, and sometimes, a guaranteed return on their investment. These additional investors are deceived into believing that by investing money, they will make more money.  However, no wealth has been created, no product has been sold, no investment has been made, and no service has been provided.  Instead, the money invested by the additional investors is used to pay the initial investor(s). Ultimately, the Ponzi scheme will fail because the fraudster runs out of people who can be deceived into joining the scheme. The fraud lies in the fact that it is impossible for the cycle to sustain itself.  The investors will eventually lose their money somewhere down the line.  The most vulnerable people are those toward the bottom of the pyramid.  Toward the bottom of the pyramid it becomes impossible to recruit enough new investors as is required to pay off the previous layer of investors.

b.      Typical characteristics of a pyramid scheme include: (1) promises of large rates of return on investment and (2) investment funds being immediately sent out to pay prior investors and not to a legitimate investment.

5.      This affidavit is intended to include facts to support the forfeiture of the Defendants named in the Complaint to which this Affidavit is attached and does not purport to set forth all of my knowledge of, or investigation into, this matter. The facts and information contained in this affidavit are based on, among other things, my personal knowledge, my training and experience, as well as my conversation with various witnesses, including law enforcement personnel who have participated in this investigation, and the review of certain documents and records.  Most notably, this affidavit does not set forth every transaction conducted in this case.

## II.  VERIFICATION OF COMPLAINT

6.      I have carefully read the Verified Complaint for Forfeiture to which this Affidavit is attached and hereby verify that the facts stated therein are true and correct.

### III.  THE SCHEME AND THE ASSETS

7.      Based on my training and experience, the statements of witnesses, and information and insight given to me by other law enforcement personnel, to include special agents of the Internal Revenue Service, Criminal Investigation ("IRS-CI"),

a.      I submit there is probable cause to believe that the following individuals:

(1)      WILLIAM M. APOSTELOS (hereinafter APOSTELOS);



(2)    CONNIE M. APOSTELOS aka CONNIE COLEMAN (WILLIAM APOSTELOS' wife) and;



(3)    REBEKAH FAIRCHILD (APOSTELOS' sister); and



REBEKAH ELECTRA FAIRCHILD

b.      the following entities:

(1)      APOSTELOS ENTERPRISES INC., formerly known as CARMEN-COLEMAN, INC., an Ohio corporation established in April of 2005 with authorized representatives CONNIE COLEMAN and WILLIAM APOTELOS, having the purpose of "Residential Construction and Remodeling";

(2)      COLEMAN CAPITAL, INC., an Ohio corporation established in May of 2008, with authorized representative CONNIE COLEMAN, having the purpose of "various business and administrattive (sic) consulting activities and services";

(3)      MIDWEST GREEN RESOURCES, LLC an Ohio limited liability company established in August of 2009, having the purpose of "investment and asset management" with authorized representatives including WILLIAM APOSTELOS, DAVID ZOELLNER, THOMAS M. TAGGART, and COLEMAN CAPITAL, INC. with CONNIE APOSTELOS signing on behalf of COLEMAN CAPITAL;

(4)      WMA ENTERPRISES, LLC an Ohio limited liability company established on October 16, 2009 with agent WILLIAM APOSTELOS, having the purpose of "Investment and Real Estate Asset Management";

(5)      SILVER BRIDLE RACING, LLC an Ohio limited liability company established in August of 2011, with agent CONNIE APOSTELOS, having the purpose of "thoroughbred horse racing business";

have been involved in a scheme to defraud investors and have committed violations of 18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plan); 18 U.S C. § 1341 (Mail Fraud); 18 U.S.C. § 1343(Wire Fraud); 18 U.S.C. § 1956 and/or 18 U.S.C. §1957 (Monetary Laundering).wire fraud and/or money laundering.

8.      I make this affidavit in support of:

a.      the forfeiture of the following assets:

(1) RACE HORSE NAMED SHANON NICOLE, Net sale proceeds in the amount of $195,772.50;

(2) RACE HORSE NAMED BARYSHNIKOV, Net sale proceeds in the amount of $3,900.50;

(3) ZIA PARK RACETRACK, Net racing proceeds in the amount of $27,548.00;

(4) SAM HOUSTON RACEPARK, Net racing proceeds in the amount of $40,546.00;

(5) ACCOUNT #****2934, US BANK, In the name of SILVER BRIDLE RACING, LLC, in the amount of $108,902.18;

(6) ACCOUNT #****3007, US BANK, In the name of SILVER BRIDLE RACING, LLC, in the amount of $22,158.63;

(7) ACCOUNT #****4687, US BANK, In the name of CONNIE APOSTELOS, in the amount of $1,599.75;

(8) ACCOUNT #****9796, KEY BANK, In the name of WMA ENTERPRISES, LLC, in the amount of $125,509.60;

(9) ACCOUNT #****9960, KEY BANK, In the name of COLEMAN CAPITAL, INC, in the amount of $8,012.75;

(10) ACCOUNT #**** 9978, KEY BANK, In the name of COLEMAN CAPITAL, INC, in the amount of $13,940.72;

(11) ACCOUNT #****1028, KEY BANK, In the name of CONNIE APOSTELOS, in the amount of $2,376.34;

(12) ACCOUNT #****9788, KEY BANK, In the name of MIDWEST GREEN RESOURCES, LLC, in the amount of $616.83;

(13) ACCOUNT #****8300, JP MORGAN CHASE, In the name of WILLIAM OR CONNIE APOSTELOS, in the amount of $2,568.42;

(14) ACCOUNT #****1858, JP MORGAN CHASE, In the name of APOSTELOS ENTERPRISES, INC, in the amount of $1,964.76;

(15) $10,007.00 IN U.S. CURRENCY;

(16) $1,000.00 IN U.S. CURRENCY;

(17) 2005 SEADOO CHALLENGER BOAT w/TRAILER, SN: JS-CFC30985E505;

(18) 2008 BMW M3, VIN: WBSWL93548PL89282;

(19) 2008 KAWASAKI TERYX KRF 750, GATOR ATV, VIN: OBLITERATED;

(20) 2008 SUN-LITE RATTLER CAMPER, MODEL 7H T21, VIN: 1S4BU212783016096;

(21) 2009 4-STAR GOOSENECK HORSE TRAILER, VIN: 4FKPG192190030562;

(22) MISCELLANEOUS ARTWORK/ SCULPTURES INCLUDING LIFE SIZE BRONZE STATUE OF BARYSHNIKOV which includes:

   a. (1) Bronze Figure of Knight "Knight Soldier" with Bronze Base 22x29x24;
   b. (1) Standing Bronze Horse with Bronze Base 86x64;
   c. (2) Silver Horse on Wood Base 20x15;
   d. (1) Horse Colored Bronze "Marius" Marked, with 2-Color Marble Base 26x16;
   e. (1) Chinese Temple Horse, Bronze 43x34;
   f. (1) Black Murano Glass Horse 15x9;

g.  (1) Silver Chariot with Driver and 2 Horses 23x15;

h.  (1) Amethyst Base Bronze Horse Head "Ebane Bronce" 19x10; and

i.  (1) Bronze Running Cheetah on Bronze Base 40x64;

(23) MISCELLANEOUS JEWELRY which includes:

a.  (1) 14K White Gold Diamond Engagement Ring;

b.  (1) Man's "Tourneau" Haute Horlogerie Diamond Watch;

c.  (1) Man's "Tourneau" Watch with White Face and Diamond Bezel;

d.  (1) Tag Heuer Man's Watch "Carrera Calibre" 1887, SN: CUZA10EWM140Z;

b.  as there is probable cause to believe APOSTELOS, CONNIE APOSTELOS, REBEKAH FAIRCHILD, and others committed the following violations:

(1)  18 U.S.C. § 1341 (Mail Fraud);

(2)  18 U.S.C. § 1343 (Wire Fraud);

(3)  18 U.S.C. § 371 (Conspiracy);

(4)  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud);

(5)  18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plan)

(6)  18 U.S.C. § 1956 (Money Laundering);

(7)  18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

(8)  18 U.S.C. § 1957 (Laundering Monetary Instruments in Excess of $10,000).

c.  and the assets listed in paragraph 8(a) above are subject to forfeiture pursuant to:

(1)  18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plan); 18 U.S. C. § 1341 (Mail Fraud); 18 U.S.C. § 1343 (Wire Fraud) or any offense constituting "specified unlawful activity" ("SUA") as defined in  18 U.S.C. § 1956(c)(7) which includes 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense (18 U.S.C. § 1349, 18 U.S.C. § 371); and/or

(2) 18 U.S.C. § 981(a)(1)(A)(civil forfeiture) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property.

## IV. THE INVESTIGATION

9. As further detailed below, your Affiant's investigation along with other agents from the IRS-CI and the FBI reveals that APOSTELOS and others have been conducting a pyramid scheme during the past several years. APOSTELOS has created several business entities to assist with the pyramid scheme, has opened several bank accounts used to facilitate obtaining and transferring the proceeds of the scheme, and for at least the past five years has lived on the proceeds obtained from defrauded investors. Since 2010, the business entities affiliated with APOSTELOS have reported very little income and more often significant losses. Thus, your Affiant's investigation has revealed that APOSTELOS and CONNIE APOSTELOS have had no legitimate source of income since 2010. Their sole source of income has been funds stolen from the investors. Those stolen funds have allowed APOSTELOS and CONNIE APOSTELOS to live glamorous lives, driving luxury vehicles such as the 2012 Lexus LS 460 and the 2008 BMW M3 convertible, all the while spending as much as $400.00 per month for Victoria's Secret lingerie and $35,000.00 per month for their horse racing hobby.

10. Your Affiant's investigation has revealed that APOSTELOS' role in the offense was one of organizing and leading. APOSTELOS came up with and presented various schemes to potential investors, luring victims to transfer assets to him or a business controlled by him, on the false pretense that he would invest the assets belonging to the victim, their assets would be safe, and due to his expertise, an extraordinary rate of return on their investment would be obtained. When in fact, APOSTELOS was not a savvy investor and failed his Series 65 Test in an attempt to become a licensed broker.

11. Your Affiant's and the Department of Labor's investigation has revealed that APOSTELOS as the majority owner and Chief Executive Manager of Midwest Green Resources, LLC ("MGR"), on or about July 15, 2010, enticed certain participants of the Beau Townsend Ford, Inc. 401(K) Plan (the "Plan") to invest nearly $2,000,000.00 of Plan assets in exchange for units of membership of MGR. However, within four days the majority of the funds were transferred out of the MGR bank account and deposited into the WMA 8143 Account. Within five months all of the funds were transferred out. APOSTELOS used the $2,000,000.00 received from the Plan for his personal use, the use of other entities controlled by APOSTELOS and to pay earlier investors. The personal transfers included two checks totaling $50,000.00 to CONNIE APOSTELOS and two wires to their personal account at Chase Manhattan totaling $90,000.00. Thus, APOSTELOS embezzled the money from the Beau Townsend employee benefit plan. To deceive the investors that their retirement funds had been invested, Plan participants were mailed individual MGR account statements on a quarterly basis that contained false account information indicating that their funds were invested. Under the pressure of an audit of MGR, APOSTELOS refunded the amounts invested on or about August 16, 2012 to the Plan participants using monies received from other APOSTELOS investors not related to the Plan.

12.     After paying back the investors from Beau Townsend in August 2012, the Ponzi scheme started to quickly unravel.  Investors began calling APOSTELOS at 35 Commercial Way in Springboro, looking for APOSTELOS and demanding to get their money back.

13.     Discussions became common among the employees that at some point the FBI was going to get involved.  REBEKAH FAIRCHILD routinely was seen crying at her desk because APOSTELOS made her put her name on the WMA Account and she was transferring new investor money as it came in to pay earlier investors who were complaining.  REBEKAH FAIRCHILD was afraid she was going to jail.

14.     Money was so tight that every day, a list of all the accounts, and their balances was provided to APOSTELOS, REBEKAH FAIRCHILD and CONNIE APOSTELOS.  This daily account balance sheet was necessary because there was not enough money to pay all the investors as their payments became due.  Each morning, APOSTELOS would tell his staff the excuse of the day- to get the investors off his back.  Excuses included staff members being sick, bank errors, and being out of town.  There came a time when staff members turned off the lights and hid in the basement to avoid investors who came to the office to collect their money.  One time, a staff member was told to go out to the parking lot and pretend to be the cleaning person and tell the investor that no one including APOSTELOS was there.

15.     CONNIE APOSTELOS kept a close eye on the investor funds coming into the office. When an investor came in with money, APOSTELOS and REBEKAH FAIRCHILD decided which of the earlier investors would be paid.  Typically, the investor complaining the loudest would get paid with the newly invested money. If APOSTELOS was not there, CONNIE APOSTELOS would instruct which bills or investors were to be paid. CONNIE APOSTELOS gave explicit instructions that the bills related to her horses and SILVER BRIDLE RACING were always to be paid first.  She did not want to be embarrassed before any of her horse racing contacts.  However, on one occasion when it was CONNIE APOSTELOS' birthday, APOSTELOS and CONNIE APOSTELOS, took approximately $25,000.00 of new investor money down to the casino to celebrate CONNIE APOSTELOS' birthday.  At that time when they were short of funds to pay earlier investors, they lost all the new investment money, plus more gambling.

16.     In addition to getting the daily balance sheet with the funds in each account, CONNIE APOSTELOS kept track of what was going on by secretly setting up the email system so that she was copied on all the email that was sent out by certain staff.

17.     The unknowing investors in the pyramid scheme include over 450 individuals from across the country and from several foreign countries.  Many of the investors have invested their retirement savings and will have no chance of recovering those investments.  These investors include local business persons, professionals, and even some retired police officers.  As of April 16, 2015, 180 investors have been interviewed by agents and police officers, and the loss amount

is estimated to be over $30,000,000.00. Additionally, questionnaires have been sent out by the FBI to all known investors in an effort to expedite the flow of information.

18. SA Vant's analysis indicates that during the period January 1, 2010 through October 29, 2014, over $84,000,000.00 was deposited in the major business bank accounts that received investor funds, including accounts in the name of WMA Enterprises, LLC, and Midwest Green Resources, LLC. These bank accounts were controlled by APOSTELOS. As of the date of this affidavit, $56,000,000.00 of the deposited funds have been identified as being disbursed to prior investors.

19. During the period of January 1, 2010 through October 29, 2014, over $12,359,852.00 was transferred into other business bank accounts controlled by APOSTELOS. Those accounts included accounts in the name of: APOSTELOS ENTERPRISES INC.; COLEMAN CAPITAL INC.; and OVO WEALTH MANAGEMENT LLC.

20. Additionally, during the period of January 1, 2010 through October 29, 2014, over $4,761,998.00 was transferred into personal accounts controlled by WILLIAM and CONNIE APOSTELOS, including accounts in the name of SILVER BRIDLE RACING, LLC.

**Wire Fraud (18 U.S.C. § 1343)**

21. Your Affiant's investigation has revealed that APOSTELOS enticed investors to send him money with false promises as to how he would invest these funds and the rates of return that would be repaid for those investments. APOSTELOS typically gives the investors a promissory note for each amount invested. APOSTELOS guaranteed a rate of return ranging from 10% to 60%. The promissory notes are typically signed by APOSTELOS in his individual name or by WMA ENTERPRISES, LLC. The Promissory Notes were notarized by REBEKAH FAIRCHILD or REBEKAH SMART-FAIRCHILD (APOSTELOS' niece, also known as REBEKAH RIDDELL).

22. APOSTELOS used the business entities as follows in the scheme:

    a. **APOSTELOS ENTERPRISES, INC.:**

        (1) established in April 2005;

        (2) agents CONNIE COLEMAN and WILLIAM APOSTELOS;

        (3) having the purpose of "Residential Construction and Remodeling";

        (4) opened PNC Account #8071 in the name of APOSTELOS ENTERPRISES, LLC, on April 23, 2010 with APOSTELOS and CONNIE APOSTELOS signing as members;

        (5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(6) funding for this account is generally from transfers from PNC Account #8143 in the name of  WMA ENTERPRISES LLC;

(7) pays expenses for WMA business including accounting services, payroll, landscaping, and utilities;

(8) occasionally pays for some of the race horse expenses;

(9) occasionally pays for personal expenses of APOSTELOS and CONNIE APOSTELOS;

(10) occasionally pays some expenses for APOSTELOS and CONNIE APOSTELOS' rental properties;

(11) filed Forms 1120 U.S. Corporate Income Tax Return for the years 2010, 2011 and 2012; and

(12) reported negative taxable income as follows:

   a. -$363,525.00 in taxable income in 2010;
   b. -$246,780.00 in taxable income in 2011; and
   c. -$78,331.00 in taxable income in 2012.

b.   **COLEMAN CAPITAL, INC.:**

 (1) established in May of 2008;

(2) authorized representative CONNIE COLEMAN;

(3) having the purpose of "various business and administrattive (sic) consulting activities and services";

(4) opened PNC Account #8119 in the name of COLEMAN CAPITAL, INC. on May 26, 2010 with CONNIE APOSTELOS signing as President;

(5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(6) funding for the account is generally from transfers from PNC Account #8143 in the name of  WMA ENTERPRISES LLC;

(7) used to pay expenses for WMA business including accounting services, payroll, landscaping and utilities;

(8) occasionally pays for some of the race horse expenses;

(9) occasionally pays for some personal expenses;

(10) filed Forms 1120, U.S. Corporate Income Tax Return for the years 2010, 2011 and 2012;

(11) reported negative taxable income as follows:

      a. -$104,910 for 2010;
      b. -$161,244 for 2011; and
      c. -$216,133 for 2012.

c.     **<u>MIDWEST GREEN RESOURCES, LLC:</u>**

(1) established in August of 2009;

(2) agents APOSTELOS and DAVID ZOELLNER on the original appointment, changing on February 11, 2010 to THOMAS M. TAGGART, and on November 12, 2013 changing to COLEMAN CAPITAL, INC. with CONNIE APOSTELOS signing;

(3) having the purpose of "investment and asset management";

(4) opened PNC Account #8135 in the name of MIDWEST GREEN RESOURCES, LLC was opened on May 3, 2010 with APOSTELOS signing as a member;

(5) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(6) funding for this account is from checks and wires from investors;

(7) funds are sometimes transferred to the PNC Account #8143 in the name of  WMA ENTERPRISES LLC ;

(8) filed Forms 1065, U.S. Return of Partnership Income for the years 2010, 2011 and 2012;

(9) reported negative taxable income as follows:

      a. -$81,116 in 2010;
      b. -$115,069 in 2011; and
      c. -$138,070 for 2012;

d. **WMA ENTERPRISES, LLC:**

(1) established on October 16, 2009;

(2) agent APOSTELOS;

(3) having the purpose of "Investment and Real Estate Asset Management";

(4) opened JP Morgan Chase Account #8375 in the name of WMA ENTERPRISES, LLC, on October 20, 2009 with APOSTELOS signing as a member;

(5) opened PNC Account #8143 in the name of WMA ENTERPRISES, LLC, on May 3, 2010 with APOSTELOS signing as a member;

(6) added REBEKAH FAIRCHILD as a signor on June 30, 2010;

(7) opened Key Bank Account #9796 in the name of WMA Enterprises, LLC, on May 3, 2010 with APOSTELOS signing as a member;

(8) used this account as the main account for receiving investor funds and paying investor funds;

(9) filed a Form 1065, U.S. Return of Partnership Income for the year 2010;

(10) reported taxable income of $0 in 2010; and

(11) did not file income tax returns for 2011, 2012 and 2013.

e. **SILVER BRIDLE RACING, LLC:**

(1) established in August of 2011;

(2) agent CONNIE APOSTELOS;

(3) having the purpose of "thoroughbred horse racing business";

(4) opened PNC Account #4464 in the name of SILVER BRIDLE RACING, LLC, on December 6, 2011 with CONNIE APOSTELOS signing as owner;

(5) REBEKAH FAIRCHILD signed as Admin;

(6) used to deposit horse racing winnings and pay expenses associated with training and maintaining thoroughbred race horses;

(7) reported as business/farm income on WILLIAM APOSTELOS and CONNIE APOSTELOS' 2011, 2012 and 2013 Forms 1040 Individual Income Tax Returns;

(8) reported net profits/losses as follows:

   a. $0 for 2011;
   b. -$76,799 for 2012; and
   c. -$279,976 for 2013.

23.     All of the above business entities are located at 35 Commercial Way, Springboro, Ohio.





24.     APOSTELOS defrauded his victims by promising a high rate of return on their investments.  The following two victims are typical.

25.     Victim 1 started investing with APOSTELOS in August of 2013 with an initial investment of $250,000.  Victim 1 made additional investments of $70,000 on October 3, 2013 by wire and $75,000 on November 15, 2013 by wire. Victim 1 was told that his investments were going to a farm in South Vienna, OH that APOSTELOS was going to purchase and resell in a short time frame. Victim 1 was promised a rate of return of 15% by APOSTELOS.  Both of the later notes ($77,000 & $75,000) were paid off by APOSTELOS with interest ($7,000 and $15,000 respectively) in the fall of 2013; although the payments were several weeks late.

26.     Victim 1's initial $250,000 investment came due and was not paid.  APOSTELOS made various excuses and offered to "roll-over" the investment multiple times.  APOSTELOS' excuses included that his sister was in the hospital and that the bank made errors negotiating the funds.  APOSTELOS told Victim 1 in December of 2013 that the investment split, but has provided no additional documentation to Victim 1 concerning the investment.  Currently, APOSTELOS is claiming the value of Victim 1's initial investment is near $500,000.

27.     Victim 1 has repeatedly requested the return of his $250,000.  Victim 1 does not expect to receive any interest from his $250,000 investment.  He simply wants the principal returned.  Victim 1 has received payments on the note including:

    a. on March 24, 2014 a $5,000 wire;
    b. on June 23, 2014 a $40,000 wire;
    c. on July 23, 2014 a $15,000 wire;
    d. on July 25 2014 a $15,000 wire; and
    e. on August 25, 2014 a $15,000 wire.

28.     Victim 1 told investigators that based on the high interest rates that APOSTELOS promised and the way that APOSTELOS conducted business, he believes that APOSTELOS is operating a pyramid scheme.

29.     On or about October 14, 2014, Victim 1 went to the office located at 35 Commercial Way, Springboro, OH in an attempt to collect more of his funds back from APOSTELOS. APOSTELOS did provide Victim 1 with a check drawn on Key Bank.  APOSTELOS brought Victim 1 through a key coded door to the basement of 35 Commercial Way, Springboro, OH.  In this space there were 6 desks with promissory notes and files covering the desks.  Victim 1 observed a server in this basement space.

30.     PNC Bank account #8143 in the name of WMA ENTERPRISES, LLC has been analyzed relating to the transfers made by Victim 1 into the WMA ENTERPRISES, LLC account and the subsequent wire transfers out of the WMA ENTERPRISES, LLC account.  In reviewing the checks and wires out of this account, SA Laurel Vant saw that within a few days of a deposit that appeared to be from an investor, payments almost always appeared to be made to other investors and not to a legitimate investment. SA Vant relayed the following:

a.      On August 22, 2013, Victim 1's check for $30,000.00 was deposited into the WMA ENTERPRISES, LLC account at PNC Bank.  On the same date, a check cleared that was drawn on the WMA ENTERPRISES, LLC account made payable to:

(1) LD in the amount of $20,000.00.

b.      There are many payments going to LD within this account and LD appears to be an investor.  Additionally two wire transfers were made out of the account to:

(1) PNC account in the name of COLEMAN CAPITAL for $3,700.00 and
(2) APOSTELOS ENTERPRISES at PNC for $200.00.

c.      On October 3, 2013, Victim 1 wire transferred $70,000 from his JP Morgan Chase account into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, there were wire transfers made out of the account to:

(1)  JD for $200,000.00;
(2)  RW for $137,280.00;
(3)  TL for $20,000.00; and
(4)  the Money Source (DAVID ZOELLNER)  for $15,000.00.

d.      There are also several checks that cleared on October 3, 2013 including checks made payable to:

(1) IF for $25,000.00 and
(2) ML for $3,000.00.

e.      On November 15, 2013, Victim 1 wire transferred $75,000 from his JP Morgan Chase account into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, there were two wire transfers going out of the WMA ENTERPRISES LLC account to:

(1) JB#1 for $2,000.00;
(2) MK for $2,000.00; and
(3) one large check in the amount of $190,000 cleared on November 15, 2013 that was made payable to Fifth Third Bank which is endorsed by TM.

31.     Victim 2 met with APOSTELOS in January of 2014. Victim 2 was very impressed and decided to invest $100,000.00.  Victim 2 was told by APOSTELOS that the funds were being invested in stocks at "Ameritrade".  APOSTELOS provided Victim 2 with a promissory note. Victim 2 was told the investments were made in APOSTELOS' name.  However, APOSTELOS told Victim 2 he could track his investment online through a purported "Ameritrade" website and his investment would be listed under the name "Mountaineer".

32.     When your Affiant contacted Victim 2, Victim 2 firmly believed that his initial investment was safe and had in fact matured after three months and was now worth $253,000 and consisted of stock in Ford, Microsoft and other investments.  Victim 2 believed his money

was safely invested because he had logged into the purported "Ameritrade" Account under the name Mountaineer as instructed by APOSTELOS, and could see his balance and his earnings sitting in the "Ameritrade" Account.

33.     Victim 2 provided your Affiant with the purported "Ameritrade" account website and login information.  Your Affiant logged into the account and found it to be a wholly owned subsidiary of "Ameritrade" called "InvesTools".   Your Affiant found over 25 accounts with varying balances.  "Mountaineer" is one of the names used on the account.

34.     Your Affiant contacted a representative with TD Ameritrade.  The TD Ameritrade representative said that the website that Victim 2 was logging into to track his investment was not a real account.  The account that Victim 2 was seeing was a training account program that can be purchased by subscription.  The training account tracks the real stock market.  Victim 2's account was only a "paper money" account meaning there is no real money in the account.

35.     In April of 2014, Victim 2 invested an additional $50,000.00 with APOSTELOS.  This investment was to go to an unnamed farm cooperative in Kentucky.  APOSTELOS indicated that the farm co-ops could not obtain bank loans to purchase equipment and seed to plant crops.  APOSTELOS advised that he would loan the money at a high interest rate and collect when the crops were harvested in the fall.  APOSTELOS promised a rate of return of 25%.  APOSTELOS told Victim 2 that these high rates were only available for a short period of time.

36.     In May of 2014, Victim 2 invested an additional $58,000.00 in APOSTELOS ENTERPRISES LLC.  In June of 2014, Victim 2 invested an additional $46,000.00 in APOSTELOS ENTERPRISES.  Victim 2 received separate promissory notes for each investment from APOSTELOS in person at 35 Commercial Way, Springboro, OH.

37.     In June of 2014, APOSTELOS gave Victim 2 a check for $48,600.00 which Victim 2 was able to negotiate.

38.     In July of 2014, APOSTELOS gave Victim 2 a check for $4,500.00.  Victim 2 called PNC and was told that there were not enough funds in the account to cover the check.  When Victim 2 called APOSTELOS about the lack of funds, APOSTELOS advised that it was a bank error.

39.     PNC Bank account #8143 in the name of WMA ENTERPRISES, LLC has been analyzed relating to the transfers made by Victim 2 into the WMA ENTERPRISES LLC account and the subsequent wire transfers out of this account.  The following transactions occurred:

        a.      On January 21, 2014, Victim 2's two checks were deposited, one in the amount of $60,000.00 and the other in the amount of $40,000.00, into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, a wire transfer was made to:

            (1) JT in the amount of $11,500.00.

b. Additional checks cleared on this date from this account were payable to:

(1) TP totaling $47,000.00;
(2) JL in the amount of $10,000.00;
(3) CD in the amount of $2,500.00; and
(4) Steven Scudder in the amount of $2,500.00.

c. On May 1, 2014, Victim 2's check in the amount of $58,000.00 was deposited into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, a wire transfer was made to:

(1) RS in the amount of $15,000.00.

d. Additional checks cleared from this account on the same date were payable to:

(1) Dl & DL in the amount of $11,811.00;
(2) MB in the amount of $11,000.00; and
(3) Fifth Third Bank / TM in the amount of $50,000.00.

e. On June 18, 2014, Victim 2's check in the amount of $30,000.00 was deposited into the WMA ENTERPRISES LLC account at PNC Bank.  On the same date, several wire transfers were made out of this account including to:

(1) Victim 1 in the amount of $20,000.00;
(2) ND in the amount of $11,515.00;
(3) MV in the amount of $10,010.00, and
(4) DT in the amount of $1,000.00.

f. Additional checks cleared from this account on the same date were payable to:

(1) LS in the amount of $33,666.00,
(2) P&LM in the amount of $12,500.00;
(3) PD in the amount of $55,000.00; and
(4) JB#2 in the amount of $33,666.00.

40. On October 3, 2014, Victim 2 met with APOSTELOS in an attempt to get his money back.  The meeting occurred in APOSTELOS' office at 35 Commercial Way, Springboro, OH. During this meeting, APOSTELOS mentioned that the investment plan had not gone the way that APOSTELOS had expected.  APOSTELOS said something to the effect that: the pyramid had crumbled. (Paraphrased.)

41. TD Ameritrade was subpoenaed for APOSTELOS' stock transactions.  As of October 10, 2014, APOSTELOS had 15 accounts with balances totaling approximately $55,486.00.  The majority of the accounts are in the names of investors, but APOSTELOS has access to these accounts.

42.     TD Ameritrade also provided an Amended Business Plan that it had received from OVO WEALTH MANAGEMENT LLC.  The principals of OVO WEALTH MANAGEMENT LLC include WILLIAM APOSTELOS, SCOTT DOAK, STEVEN SCUDDER and DAVE ZOELLNER.  WILLIAM APOPSTELOS is the majority owner, Chief Investment Officer and Treasurer.  The plan states that:

> APOSTELOS began trading equities, options and commodities in 1984.  His trading skills and successes have not only provided him a comfortable and independent life, but are well known both locally and nationally through a loyal and broad network of clients, professionals and friends.  Mr. APOSTELOS' reputation and track record of carefully and profitably navigating bear market conditions over the years by remaining adaptable and anticipating changes will benefit OVO WEALTH MANAGMENT, LLC and its clients.

43.     The plan goes on to speak about the target market and provides marketing and growth strategies.

44.     Your Affiant's investigation has revealed that at least 3 lawsuits were filed recently in Warren County seeking the repayment of money invested with APOSTELOS.  Details of these lawsuits are as follows:

        a.      On May 23, 2014, Maximum Flight Advantages, LLC filed a complaint alleging that APOSTELOS executed and delivered to Maximum Flight Advantages, LLC a promissory note on November 13, 2012 in the principal amount of $367,000.00 and the defendant failed to pay on the note. The plaintiff demanded judgment in the amount of $280,000.  The attorney for APOSTELOS confessed judgment in the amount of $280,000 and a judgment was entered in favor of the plaintiff, Maximum Flight Advantages, LLC, in the amount of $280,000.00.

        b.      On June 23, 2014, Dave Dennis, Inc. and Jason J. Dennis filed a complaint against MIDWEST GREEN RESOPURCES, LLC, APOSTELOS and WMA ENTERPRISES, LLC alleging that two promissory notes were unpaid.  First, the complaint alleges that on August 1, 2012, MIDWEST GREEN RESOURCES, LLC executed and delivered a promissory note to Dave Dennis, Inc. in the amount of $1,000,000.00.  MIDWEST GREEN RESOURCES, LLC paid $500,000.00 in interest on August 22, 2013 and $300,000.00 in interest on October 8, 2013. However, the note was in default and the principle of $1,000,000.00 plus accrued interest of $200,000.00 was owed to Dave Dennis.  Second, the complaint alleges that on October 10, 2013, APOSTELOS executed and delivered to Jason Dennis a promissory note for the principle sum of $1,100,000.00.  The complaint alleges that APOSTELOS is in default on this note and owes Jason Dennis the principle amount of $1,100,000.00 plus interest at the rate of 3% per annum.  A confession of judgment was filed by MIDWEST GREEN RESOURCES, LLC  and by APOSTELOS on June 23, 2014.  Judgments were entered against MIDWEST GREEN RESOURCES, LLC and WILLIAM APOSTELOS for the amounts alleged in the complaint.

        c.      On July 15, 2014, Christopher Heizer filed a complaint alleging that APOSTELOS executed and delivered to Christopher Heizer a cognitive promissory note on April 29, 2013 in the principal amount of $327,848.26 and the defendant failed to pay on the

note. The Plaintiff submitted an affidavit stating that on April 18, 2013, he wire transferred to WILLIAM APOSTELOS dba MIDWEST GREENE (sic) RESOURCES, $327,848.27, and that money was from an IRA and was to be invested by APOSTELOS. On August 21, 2013, APOSTELOS paid Heizer $50,000.00 and on December 19, 2013, APOSTELOS paid $5,000.00. The interest rate promised was 20%. The attorney for APOSTELOS confessed judgment for a total amount of $338,417.91 plus interest accrued after May 29, 2014 and a judgment entry was filed.

45.     The investigation has revealed that APOSTELOS kept QuickBooks and records detailing the amounts invested by all investors and the amounts paid to those investors. Records have also been obtained which document the story that APOSTELOS gave the investor regarding how the investor's money was being invested in "Ameritrade" and excuses made as to why the investor had not yet received the promised return on his or her investment.

46.     By convincing investors that the money would be invested and high rates of return were guaranteed, and using wire communications to obtain funds from investors and/or to transfer the funds to other investors or to other accounts controlled by APOSTELOS, APOSTELOS and others committed wire fraud and conspired to commit wire fraud in violation of 18 U.S.C. §§ 1343 and 1349.

## MONEY LAUNDERING (18 U.S.C. § 1956 AND § 1957)

47.     Based on my training and experience, I know that individuals who receive funds from a particular crime will attempt to legitimize the proceeds of the crime, or conceal the nature, source, or ownership of the proceeds by depositing the funds into bank accounts in nominee names, or transfer the funds through one or more bank accounts in an attempt to further conceal the nature, source, or ownership of the funds.

48.     Further, transferring funds to prior investors disguised as interest payments using the funds of later investors to encourage further investment and thereby promote the pyramid scheme, and in order to conceal the nature, source, ownership or control of those funds is money laundering in violation of 18 U.S.C. § 1956.

49.     Spending or transferring the fraudulently obtained funds though financial transactions in amounts over $10,000 is money laundering in violation of 18 U.S.C. §§ 1957.

50.     IRS-CI Special Agent Laurel Vant analyzed the WMA ENTERPRISES, LLC, PNC Account #8143 for the period of January 1, 2010 through October 29, 2014 and determined that this was the main account into which the investor funds were deposited and the account out of which funds were paid back to earlier investors in the pyramid scheme.

51. During the period of January 1, 2010 through October 29, 2014, approximately four years and ten months:

    a.    over $66,000,000.00 went through this account;

    b.    of the $66,000,000.00 deposited into the account, an estimated $45,900,000.00 was deposits from investors, and $8,900,000.00 were transfers from related business accounts which received investor funds;

    c.    over $4,900,000.00 was deposited from known investment companies including trust companies such as PENSCO and Kingdom Trust;

    d.    over $737,000,000.00 in cash was deposited into the account;

    e.    over $51,000,000.00 was sent back to prior investors;

    f.    over $7,900,000.00 was transferred into other bank accounts that APOSTELOS and CONNIE APOSTELOS controlled, including APOSTELOS ENTERPRISES INC., OVO WEALTH MANAGEMENT LLC, COLEMAN CAPITAL INC., MIDWEST GREEN RESOURCES, LLC, SILVER BRIDLE RACING, LLC, and personal accounts; and

    g.    withdrawals totaling over $1,902,685.00 were made; including cash withdrawals and funds converted into cashier's checks.

## WILLIAM APOSTELOS' and CONNIE APOSTELOS' REPORTED INCOME

52. IRS-CI Special Agent Laurel Vant reviewed the tax returns filed by WILLIAM and CONNIE APOSTELOS, the returns filed by the businesses controlled by APOSTELOS and the bank accounts controlled by APOSTELOS and determined that the majority of the money obtained by APOSTELOS, CONNIE APOSTELOS and the business entities they controlled were the proceeds of various pyramid schemes. None of the businesses appeared to be legitimate, nor were they profitable. APOSTELOS lost money on his investments. APOSTELOS lost money gambling. APOSTELOS lost money racing horses. APOSTELOS lost money with his rental properties. Virtually everything WILLIAM and CONNIE APOSTELOS acquired came from the proceeds of the defrauded investors.

53. APOSTELOS and CONNIE APOSTELOS filed Forms 1040, Individual Income Tax returns for the years 2010, 2011, 2012 and 2013.

54. On their 2010 Form 1040, WILLIAM and CONNIE APOSTELOS reported a total adjusted gross income of $13,589.00. This adjusted gross income comes from:

    a.    CONNIE reported wages from APOSTELOS ENTERPRISES, INC. in the amount of $41,589.00;

b.    capital losses from stock sales of -$1,475,120.00, which were limited to a $3,000.00 loss; and

c.    losses totaling $25,000.00 from three rental properties.

55.    On their 2011 Form 1040, WILLIAM and CONNIE APOSTELOS reported a negative adjusted gross income of -$49,026.00.  This adjusted gross income comes from:

a.    CONNIE reported wages from APOSTELOS ENTERPRISES, INC. in the amount of $41,316.00;

b.     interest income in the amount of $41.00 from TD Ameritrade and Blackstone Group;

c.    dividends totaling $6,591.00 from TD Ameritrade and Blackstone Group;

d.    zero profit from the horse racing/breeding business with income of $377,285.00 negated by the Cost of Goods Sold and Expenses in the amount of $377,285.00;

e.    capital losses from stock sales of -$1,830,246.00 which were limited to a $3,000.00 loss;

f.    losses totaling $25,000.00 from three rental properties; and

g.    losses from gambling in the amount of $68,974.00.

56.    On their 2012 Form 1040, WILLIAM and CONNIE APOSTELOS reported an adjusted gross income of $18,535.00.  This adjusted gross income comes from:

a.    CONNIE reported wages from COLEMAN CAPITAL, INC. in the amount of $54,835.00;

b.    CONNIE reported wages from APOSTELOS ENTERPRISES in the amount of $3,176.00;

c.    interest income in the amount of $13.00;

d.    dividends totaling $23.00;

e.    capital losses from stock sales of -$1,303,904.00, which were limited to a $3,000.00 loss;

f.    losses totaling $25,000.00 from three rental properties;

g.    a loss for the business called SILVER BRIDLE, LLC, described as Racing Breeding, in the amount of $76,799.00;

h.      a loss for the sale of business property in the amount of $129,419.00 which was for the sale of a rental property and a horse; and

i.      a gain from gambling in the amount of $205,720.00.

57.     On their 2013 Form 1040, WILLIAM and CONNIE APOSTELOS reported an adjusted gross income of $-285,280.00.  This adjusted gross income includes the following amounts which were:

a.      gambling losses of $227,264.00;

b.      net short term capital losses of $-1,303,090.00 which were limited to a $3,000.00 loss and;

c.      net long term capital losses of $-163.

## PNC BANK ACCOUNTS

58.     SA Laurel Vant also reviewed the bank account records for the accounts held by APOSTELOS, CONNIE APOSTELOS, REBEKAH FAIRCHILD, and the businesses they controlled.  Those accounts included the following:

a.      Personal Accounts of WILLIAM and CONNIE APOSTELOS:

(1)      PNC Account #9058 in the names of WILLIAM APOSTELOS, CONNIE APOSTELOS and REBAKAH FAIRCHILD, opened on May 3, 2010 with WILLIAM APOSTELOS and CONNIE APOSTELOS listed as signors on the account.  REBEKAH FAIRCHILD was added as a signor on July 13, 2010; and

(2)      PNC Account #9299 in the names of WILLIAM APOSTELOS, CONNIE APOSTELOS and REBEKAH FAIRCHILD, opened on May 3, 2010 with WILLIAM APOSTELOS and CONNIE APOSTELOS listed as signors on the account.  REBEKAH FAIRCHILD was added as a signor on July 13, 2010.

b.      APOSTELOS ENTRPRISES, INC.:

(1)      PNC Account #8071 in the name of APOSTELOS ENTERPRISES, INC., opened on April 23, 2010 with WILLIAM and CONNIE APOSTELOS signing as members. REBEKAH FAIRCHILD was added as a signor on June 30, 2010;

(2)      PNC Account #8098 in the name of APOSTELOS ENTERPRISES, INC., Tax Account, opened on April 23, 2010 with WILLIAM and CONNIE APOSTELOS signing as members.  REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

      c.      COLEMAN CAPITAL, INC.:

      (1)      PNC Account #8119 in the name of COLEMAN CAPITAL, INC., opened on May 26, 2010 with CONNIE APOSTELOS signing as President. REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

      d.      MIDWEST GREEN RESOURCES, LLC

      (1)      PNC Account #8135 in the name of MIDWEST GREEN RESOURCES, LLC opened on May 3, 2010 with WILLIAM APOSTELOS signing as a member. REBEKAH FAIRCHILD was added as a signor on June 30, 2010; and

      (2)      PNC Account #8127 in the name of MIDWEST GREEN RESOURCES, LLC Escrow Account, opened on April 26, 2010 with WILLIAM APOSTELOS signing as CEO. REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

      e.      WMA ENTERPRISES, LLC:

      (1)      PNC Account #8143 in the name of WMA ENTERPRISES, LLC, opened on May 3, 2010 with WILLIAM APOSTELOS signing as a member. REBEKAH FAIRCHILD was added as a signor on June 30, 2010.

      f.      SILVER BRIDLE RACING, LLC:

      (1)      PNC Account #4464 in the name of SILVER BRIDLE RACING, LLC, opened on December 6, 2011 with CONNIE APOSTELOS signing as owner and REBEKAH FAIRCHILD signing as Admin.

59.     The deposits into WILLIAM and CONNIE APOSTELOS' personal bank accounts above and the assets purchased are grossly inconsistent with the large losses listed on their tax returns and the tax returns of the entities that they are associated with for the years 2010-2013. Based on a review of the above bank accounts, it appears that WILLIAM and CONNIE APOSTELOS lost money with their rental properties, lost money with their thoroughbred racing, lost money gambling and lost money investing. The only source of money appears to be money deposited by investors.

60.     WILLIAM and CONNIE APOSTELOS lived off the funds withdrawn from the WMA ENTERPRISES, LLC Account that were deposited or wired into their personal bank accounts, including JP Morgan Chase Account #8300 and PNC Bank Account #9058, and Silver Bridle Racing LLC PNC Account #4464. Many of the cash deposits made into the personal accounts were traced to cash withdrawals on the same date from the WMA Enterprises PNC Account #8143. The total amount of cash and check deposits and wire transfers from the WMA account to the APOSTELOS' personal accounts, including Silver Bridle Racing, LLC, was:

      (1)      $2,010,630 in 2010;
      (2)      $1,475,300 in 2011;

      (3)     $937,034 in 2012.

      (4)     $426,767 in 2013; and

      (5)     $540,319 in 2014

61.     In early October 2014, PNC closed all the accounts associated with the APOSTELOS due to the appearance of suspicious activity in the accounts.

**ASSETS:**

62.     Despite the meager income reported by the APOSTELOS, and the significant losses suffered by their businesses, the APOSTELOS acquired significant assets including:

     a.      **BANK ACCOUNTS**

     (1)     **Key Bank Account #9796 (Defendant 8)** in the name of WMA ENTERPRISES, LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors. The Key Bank accounts were opened in approximately June of 2014. There was not a lot of activity in the Key Bank accounts until approximately September 2014. Key Bank Account #9676 appears to be the main business account where investor funds were deposited. From September 22, 2014 to October 21, 2014, a total of approximately $2,100,000.00 was wire transferred into Key Bank Account #9676. The majority of the $2,100,000.00 appears to be from investors. Again, the activity in the Key Bank Accounts shows that as soon as the investor money came in, it was wired back out to other apparent investors. Between September 22, 2014 and October 21, 2014, approximately $890,000.00 was wired out of Key Bank Account #9676 to individuals that appear to be investors. A large wire was received into Key Bank Account #9676 on October 23, 2014 in the amount of $850,000.00.

     (2)     **Key Bank Account #9788 (Defendant 10)** in the name of MIDWEST GREEN RESOURCES LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors;

     (3)     **J.P. Morgan Chase Bank Account #****8300 (Defendant 13)** in the names of WILLIAM M. APOSTELOS or CONNIE M. APOSTELOS;

     (4)     **J.P. Morgan Chase Bank Account #****1858 (Defendant 14)** in the name of APOSTELOS ENTERPRISES, INC.;

     (5)     **KeyBank account #1028 (Defendant 11)** in the name of CONNIE APOSTELOS (all remaining contents);

     (6)     **KeyBank Account #9960 (Defendant 9)** in the name of COLEMAN CAPITAL INC., (all remaining contents);

     (7)     **KeyBank Account #9978 (Defendant 12)** in the name of COLEMAN CAPITOL INC.(all remaining contents);

(8)    **U.S. Bank Account #2934 (Defendant 5)** in the name of SILVER BRIDLE RACING, LLC (all remaining contents)

(9)    **U.S. Bank Account #3007 (Defendant 6)** in the name of SILVER BRIDLE RACING, LLC, (all remaining contents);

(10)    **U.S. Bank Account #4687 (Defendant 7)** in the name of CONNIE APOSTELOS (all remaining contents);

b.    **REAL ESTATE**

(1) **35 Commercial Way, Springboro Ohio for $319,000.00;**



(A) According to records at the Warren County Recorder's Office, 35 Commercial Way pictured above was purchased by COLEMAN CAPITAL, INC. on December 12, 2012 for $319,000.00.  The majority of the funds to purchase this property can be traced to the WMA ENTERPRISES, LLC PNC Account #8143, the main account where investor funds were deposited and wired into.

(B) On November 19 and 21, 2012, $5,000.00 and $25,000.00 were transferred from PNC Account #8143 in the name of WMA ENTEPRISES, LLC to PNC Account #8119 in the name of COLEMAN CAPITAL, INC.

(C) On November 21, 2012 checks #30601 and 30602 made payable to Laurito & Laurito were drawn on the COLEMAN CAPITAL INC. PNC Account #8119 in the amounts of $25,000.00 and $5,000.00 respectively.

(D) On December 10, 2012, $244,000.00 was transferred from the WMA ENTERPRISES, LLC Account #8143 to COLEMAN CAPITAL INC.'s PNC Account #8119.

(E) On December 10, 2012, $244,000.00 was withdrawn by REBEKAH FAIRCHILD and converted into PNC cashier's check #856693 in the amount of $244,000 payable to Beverly Laurito.  The remitter on the check is listed as CONNIE APOSTELOS.

(2)    **168 acres on S Houston Pike, South Vienna Ohio for $1,010,000.00;**



(A) According to records from the Clark County Recorder's Office, on June 21, 2013, APOSTELOS purchased the farm on Houston Pike in South Vienna, Ohio pictured above for $1,010,000.00.  APOSTELOS purchased the farm from Heidi (nee Hook) Black and John Hook;

(B) On July 24, 2013, APOSTELOS quit claim deeded the property for $0.00 to the WMA Trust, with STEVEN SCUDDER as the trustee.  The county records do not show a mortgage on this property;

(C) Rent payments were being deposited into WMA ENTERPRISES' PNC Account #8143 and MIDWEST GREEN RESOURCES' PNC Account #8135.  One check, made payable to WILLIAM APOSTELOS, was deposited into the WMA ENTERPRISES' PNC Account #8143 on May 13, 2013 from Rittenhouse Farms in the amount of $9,000.00.  The Memo line reflects the notation "Rent on Hook Farm – Apostelos".

(D)  Heidi Black and her two siblings were interviewed by law enforcement.  Black stated that John Hook passed away in 2011 and Heidi Black became the trustee of the John Hook Revocable Trust.  Black and her sisters Lynn Stoddard and Jonda Bauch were the beneficiaries of this trust.  At the end of 2012, the trust was settled.  Black had met WILLIAM APOSTELOS several times because her father had been an investor and APOSTELOS was aware of the farm.  APOSTELOS went to Black's home at the end of 2012 and told her that he wanted to purchase the farm.  He offered to purchase it with a 3 year promissory note.  He told her that he would put the property in the name of a trust so that if he defaulted on the loan, the farm would revert to herself and her sisters as the beneficiaries of the trust.  Black and her sisters were to receive interest payments bi-annually of $33,000.  At the end of the three years, APOSTELOS was to pay back the full note amount of $1,010,000.  Black agreed to APOSTELOS' terms.  They met in June of 2013 to sign the paperwork.  Present at this meeting were Heidi Black, Lynn Stoddard, Ron Stoddard, Jonda Bauch, APOSTELOS, Steven Scudder, and briefly Rebekah Fairchild (to notarize documents).  Both APOSTELOS and Scudder separately told the sisters that the property would be put in the name of the trust and they would be the beneficiaries on this trust so that if APOSTELOS defaulted, the property would go back to them.  Black signed all of the documents on June 21, 2013.  She is not sure why some of the documents were pre-dated in February.  Black identified her signature on the Agreement to Purchase Real Estate, and the Deed of Trust.  Black never saw the trust documents indicating that she and her sisters were the beneficiaries; she just assumed that the trust was set up this way based on the word of APOSTELOS and Scudder.  Black had a separate agreement with APOSTELOS that she would buy back a 15 acre section of the land that her house and outbuildings sat on – 496 S. Houston Pike, South Vienna, OH.  Black was to pay $200,000 for this land and the outbuildings.  This was an oral agreement and is not in writing anywhere except for a mention of it in paragraph 11 on page 4 of the Agreement to Purchase Real Estate.  This paragraph indicates that Black was leasing the land with an option to purchase the land and outbuildings back.  Black had a meeting with APOSTELOS in August of 2014.  APOSTELOS agreed at this meeting to deed this lot of land back to her, but this never occurred.

c.  **VEHICLES**

(1) a 2012 Ford F350 Pickup Truck, VIN: 1FT8W3DTXCEC81383 in the name of COLEMAN CAPITAL, INC. on September 12, 2012 for $63,720.00 from Beau Townsend Ford. There is a lien with Ford Motor Credit Company.



(2)  a 2012 Lincoln Navigator 2012 Lincoln Navigator VIN: 5LMJJ3J59CEL08992 purchased in the name of APOSTELOS ENTERPRISES, INC. on January 12, 2013 for $65,845.00 from Beau Townsend Ford Inc. There is a lien with Lincoln Automotive Financial Services.



(3)	the 2012 Lexus LS 460 VIN: JTHCL5EF5C5013783 pictured below was purchased on March 27, 2012 by CONNIE APOSTELOS for $74,200.00 from Lexus of Dayton.  There is a lien on this vehicle with Toyota Motor Credit Corp.  There were payments made out of the various PNC business bank accounts to T.M.C.C. in the amount of $2,263.00.



(4)	a 2008 BMW M3 convertible **(Defendant 18)** VIN: WBSWL93548PL89282 was purchased by WILLIAM APOSTELOS on December 26, 2008 in the amount of $73,573.00 from Evans Motorworks, and was transferred to CONNIE APOSTELOS on March 26, 2014 for $0.00;



d. **RACE HORSES**

(1) a race horse pictured below named BARYSHNIKOV **(Defendant 2)** owned by CONNIE APOSTELOS and/or SLVER BRIDLE RACING LLC;





(2)     a race horse named BERN LEGACY owned by CONNIE APOSTELOS, pictured below in the winner's circle with WILLIAM APOSTELOS and CONNIE APOSTELOS; and



(3)     a race horse named SHANON NICOLE (**Defendant 1**) pictured below owned by CONNIE APOSTELOS;



e. **MISCELLANEOUS SCULPTURES/ART (Defendant 22)**

(1) a six foot stallion that appears to resemble Baryshnikov.





(2)  One Bronze Figure of Knight "Knight Soldier" with Bronze Base 22x29x24;



(3)  One Standing Bronze Horse with Bronze Base 86x64;



(4)  Two Silver Horses on Wood Base 20x15;



(5) One Bronze colored Horse "Marius" with 2-Color Marble Base 26x16;

(6)  One Chinese Temple Horse, Bronze 43x34;

(7)  One Black Murano Glass Horse 15x9;



(8)  One Silver Chariot with Driver and 2 Horses 23x15;



(9)  One Amethyst Base Bronze Horse Head "Ebane Bronce" 19x10; and



(10) One Bronze Running Cheetah on Bronze Base 40x64; and



      f.      **MISCELLANEOUS JEWELRY (Defendant 23)** which includes:

      (1) 14K White Gold Diamond Engagement Ring;

      (2) Man's "Tourneau" Haute Horlogerie Diamond Watch;

      (3) Man's "Tourneau" Watch with White Face and Diamond Bezel; and

      (4) Tag Heuer Man's Watch "Carrera Calibre" 1887, SN: CUZA10EWM140Z.

63.     On October 29, 2014, agents from the FBI, IRS and Department of Labor along with officers from the State Department of Commerce, Ohio BCI, the Springboro Police Department executed federal search warrants at 35 Commerce Way in Springboro, and the residence of APOSTELOS in Springboro.

64.     During the search, officers located many promissory notes executed between victims and APOSTELOS and/or the companies he controls. Additional documents obtained during the search reveal that:

      (1) KeyBank account #1028 in the name of CONNIE APOSTELOS was funded with deposit on 4/14/14 for $15,000 check drawn on Horseshoe Casino;

      (2) Key Bank Account #9960 in the name of COLEMAN CAPITAL INC., has a balance of $8,012.75 and was funded with a deposit from the PNC COLEMAN CAPITAL Account #8119 on October 2, 2014 in the amount $29,543.40;

      (3) Key Bank Account #9978 in the name of COLEMAN CAPITOL INC. has a balance of $13,940.72 which was funded from:

      (A) a deposit from J.P. Morgan Chase Bank Account #1858 in the name of APOSTELOS ENTERPRISES, INC. in the amount of $3,700 on 10/2/14;

      (B) a deposit of a PNC Cashier's check in the name of COLEMAN CAPITAL, INC. Tax Account in the amount of $3,989.31 ON October 2, 2014;

      (C) a deposit from J.P. Morgan Chase Bank Account #1858 in the name of APOSTELOS ENTERPRISES, INC. in the amount of $3,131.09 on October 10, 2014; and

      (D) a transfer from Key Bank Account #9960 in the name of COLEMAN CAPITAL, INC. in the amount of $3,120.00 on October 24, 2014;

      (4) U.S. Bank Account #2934 in the name of SILVER BRIDLE RACING, LLC has a balance of $109,904.68 and was funded with:

      (A) a deposit from Remington Park Casino on October 17, 2014 in the amount of $105,065.42; and

(B) a deposit from Jeffrey Columbro on October 14, 2014 in the amount of $4,000; and

(C) a deposit of PNC Official Check in the amount of $2,363.00 on October 14, 2014.

(5) U.S. Bank Account #3007 in the name of SILVER BRIDLE RACING, LLC, has a balance of $22,158.63 was funded with a deposit from CENTAUR ACQUISITION, LLC on September 23, 2014 in the amount of $44,000.00; and

(6) U.S. Bank Account #4687 in the name of CONNIE APOSTELOS has a balance of $1,599.75 was funded with a deposit from J.P. Morgan Chase Bank Account #1858 on October 14, 2014 in the amount of 10/10/14.

65.     Seizure warrants for the following assets were obtained on October 28, 2014:

(1) Key Bank Account #9796 in the name of WMA ENTERPRISE, LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors (all remaining contents);

(2) Key Bank Account #9788 in the name of MIDWEST GREEN RESOURCES LLC with WILLIAM APOSTELOS and REBEKAH FAIRCHILD as the signors (all remaining contents);

(3) **J.P. Morgan Chase Bank Account #8300 (Defendant 13)** in the names of WILLIAM M. APOSTELOS or CONNIE M. APOSTELOS ($2,568.42);

(4) **J.P. Morgan Chase Bank Account #1858 (Defendant 14)** in the name of APOSTELOS ENTERPRISES, INC. ($1,964.76);

(5) **2008 BMW M3 Convertible (Defendant 18)** VIN: WBSWL93548PL89282 in the name of CONNIE APOSTELOS;

(6) 2012 Lincoln Navigator with VIN: 5LMJJ3J59CEL08992 in the name of APOSTELOS ENTERPRISES, INC.; and

(7) 2012 Ford 350 Pickup Truck with VIN: 1FT8W3DTXCEC81383 in the name of COLEMAN CAPITAL, INC.;

(8) 2012 Lexus LS 460 with VIN: JTHCL5EF5C5013783 titled to CONNIE APOSTELOS;

(9)  one Race Horse named **BARYSHNIKOV (Defendant 2)** owned by CONNIE APOSTELOS and/or SILVER BRIDLE RACING LLC;

(10)  one Race Horse named BERN LEGACY owned by CONNIE APOSTELOS; and

(11) one Race Horse named **SHANON NICOLE (Defendant 1)** owned by CONNIE APOSTELOS;

66.    The following vehicles were seized pursuant to seizure warrants:

a.    **2008 BMW M3 Convertible (Defendant 18)** with VIN: WBSWL93548PL89282 in the name of CONNIE APOSTELOS;

b.    2012 Lincoln Navigator with VIN: 5LMJJ3J59CEL08992 in the name of APOSTELOS ENTERPRISES, INC.; and

c.    2012 Ford 350 Pickup Truck with VIN: 1FT8W3DTXCEC81383 in the name of COLEMAN CAPITAL, INC.;

d.    2012 Lexus LS 460 with VIN: JTHCL5EF5C5013783 titled to CONNIE APOSTELOS;

67.    Additional seizure warrants for the following Bank Accounts were obtained October 30, 2014:

(1)  Key Bank Account #9796 in the name of WMA ENTERPRISE, LLC;

(2)  KeyBank account #1028 in the name of CONNIE APOSTELOS;

(3)  Key Bank Account #9960 in the name of COLEMAN CAPITAL INC.;

(4)  Key Bank Account #9978 in the name of COLEMAN CAPITOL INC.;

(5)  U.S. Bank Account #2934 in the name of SILVER BRIDLE RACING, LLC;

(6)  U.S. Bank Account #3007 in the name of SILVER BRIDLE RACING, LLC;

(7)  U.S. Bank Account #4687 in the name of CONNIE APOSTELOS;

68.    As of April 16, 2015, the number of victims identified has increased from approximately 160 victims to over 450 victims.

69.     Three creditors filed an Involuntary Chapter 7 Bankruptcy Petition for APOSTELOS alleging that APOSTELOS owes them approximately $5,222,082.81.  Since the filing of the involuntary bankruptcy, many more victim investors have come forward and filed claims.

70.     In order to preserve the value of the horse named SHANON NICOLE as a racing prospect, and to maximize the amount of money that may be returned to the victims through the United States forfeiture action, the horse was released to its trainer pursuant to Court Order to allow the trainer to enter the horse in a race at Zia Park and a race at Sam Houston.  The horse placed third in both races. The net race proceeds were **$27,548.00 (Defendant 3)** and **$40,546.00 (Defendant 4)**.

71.     At the earliest opportunity, the seized horses, SHANON NICOLE and BARYSHNIKOV were sold at the Fasig-Tipton auction in Kentucky.  The net sale proceeds from the sale of **SHANON NICOLE (Defendant 1)** were $195,772.50.  The net sale proceeds from the sale of BARYSHNIKOV **(Defendant 2)** were $3,900.50.

72.     The United States intends to use the net proceeds of Defendant assets to defray the losses suffered by the victims.

73.     Based on the above,

        a.      there is probable cause to believe APOSTELOS, CONNIE APOSTELOS, REBEKAH FAIRCHILD, and others committed the following violations:

                (1)  18 U.S.C. § 1341 (Mail Fraud);

                (2)  18 U.S.C. § 1343 (Wire Fraud);

                (3)  18 U.S.C. § 371 (Conspiracy);

                (4)  18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud);

                (5)  18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plan)

                (6)  18 U.S.C. § 1956 (Money Laundering);

                (7)  18 U.S.C. § 1956(h) (Conspiracy to Commit Money Laundering); and

                (8)  18 U.S.C. § 1957 (Laundering Monetary Instruments in Excess of $10,000); and

        b.      the assets named as the Defendants in the Complaint;

  c.   are subject to forfeiture pursuant to:

    (1)  18 U.S.C. § 981(a)(1)(C)(civil forfeiture) as property, real or personal which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 664 (Theft or Embezzlement from Employee Benefit Plan); 18 U.S C. § 1341 (Mail Fraud); 18 U.S.C. § 1343 (Wire Fraud) or any offense constituting "specified unlawful activity" ("SUA") as defined in  18 U.S.C. § 1956(c)(7) which includes 18 U.S.C. § 1956 (Money Laundering), 18 U.S.C. § 1957 (Laundering SUA Proceeds in Excess of $10,000.00); or a conspiracy to commit such offense (18 U.S.C. § 1349, 18 U.S.C. § 371); and/or

    (2) 18 U.S.C. § 981(a)(1)(A)(civil forfeiture) as property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956 or 18 U.S.C. § 1957, or any property traceable to such property.
.

Your Affiant further sayeth naught.

        s/Michael Bush          
        Michael Bush
        Special Agent
        Federal Bureau of Investigation


Subscribed and sworn to before me this 17th day of April, 2015

        s/Pamela M. Stanek         
        Pamela M. Stanek
        Notary, My Commission Does Not Expire